# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 1:19-cv-2392

JOUREY NEWELL, individually and on behalf of a class of all persons and entities similarly situated,

    Plaintiff,

v.

HOMEADVISOR, INC.,

    Defendant.

## DEFENDANT HOMEADVISOR, INC.'S MOTION TO STAY PROCEEDINGS

In the event that this Court does not grant Defendant HomeAdvisor, Inc.'s Motion to Dismiss filed contemporaneously herewith, HomeAdvisor, Inc. ("HomeAdvisor") respectfully moves the Court for an order staying this action under the primary jurisdiction doctrine pending the forthcoming ruling from the Federal Communications Commission (the "FCC") regarding the definition of an automatic telephone dialing system ("ATDS" or "autodialer") under the Telephone Consumer Protection Act, 47 U.S.C. §§ 227 *et seq.* (the "TCPA"). Alternatively, the Court should stay this action pursuant to its inherent power to do so because a stay of this action pending the FCC's ruling will promote judicial efficiency and economy, will reduce the burden of litigation on the parties, and will not prejudice Plaintiff.

## CERTIFICATE OF CONFERRAL

Pursuant to D.C.COLO.LCivR 7.1(a), undersigned counsel certifies that she telephonically conferred with counsel for Plaintiff on October 1, 2019, and Plaintiff opposes this Motion.

# **INTRODUCTION**

Plaintiff alleges that HomeAdvisor violated the TCPA by using an ATDS to place calls to Plaintiff and members of a putative nationwide class. Whether HomeAdvisor did or did not utilize an ATDS will be one of the key issue in this case. However, considerable confusion and uncertainty exists regarding this issue. In fact, in light of the D.C. Circuit's recent decision in *ACA Int'l v. FCC*, 885 F.3d 687 (D.C. Cir. 2018), the FCC is currently considering **what constitutes an "automatic telephone dialing system?"**[1]

In *ACA International*, the D.C Circuit rejected the FCC's prior interpretation of what constitutes an ATDS and within a week of the mandate issuing, the FCC had already begun the process of seeking public comments. All signs indicate that the FCC intends to narrow the scope of what constitutes an ATDS. *See infra* at 8 n.16. However, because the D.C. Circuit failed to promulgate a new standard of what constitutes an ATDS, until the guidance from the FCC is released, tremendous uncertainty remains over the scope of the D.C. Circuit's ruling and what qualifies as an ATDS. This uncertainty has led to a series of inconsistent results throughout the country. The Tenth Circuit has not yet addressed the issue.

In the current climate, the prudent course for this Court is to stay this litigation pending the FCC's guidance. Congress has granted the FCC the authority to resolve issues (such as this one) regarding the implementation, interpretation, and enforcement of the TCPA. The FCC has the requisite expertise and statutory authority to clarify what equipment qualifies as an ATDS. Further, the FCC's decision regarding these issues will have a significant—and likely

---

[1] *See* FCC Public Notice, "Consumer and Governmental Affairs Bureau Seeks Comment on Interpretation of the Telephone Consumer Protection Act in Light of the D.C. Circuit's ACA International Decision," CG Docket Nos. 18-152, 02-278 (the "Public Notice").

dispositive—impact on this case. For similar reasons, courts in the Tenth Circuit have stayed TCPA actions pending the issuance of prior FCC orders defining an ATDS. *See, e.g., Higgenbotham v. Diversified Consultants, Inc.*, No. 12-2624-JTM, 2014 U.S. Dist. LEXIS 65915, at *10 (D. Kan. May 14, 2014); *Lee v. LoanDepot.com, LLC,* No. 14-1084-MLB, 2014 U.S. Dist. LEXIS 115749, at *4-5 (D. Kan. Aug. 20, 2014). Further, several courts have stayed putative TCPA class actions pending a ruling by the FCC on the definition of an ATDS pursuant to the currently pending Public Notice. *See, e.g.*, *Secure v. Ultimate Fitness Grp., LLC*, No. 18-cv-20483, 2019 U.S. Dist. LEXIS 45194, at *2 (S.D. Fla. Mar. 18, 2019).

## BACKGROUND

**I.      The Complaint Allegations Focus On The Alleged Use Of An ATDS.**

Plaintiff's Complaint alleges that HomeAdvisor violated the TCPA by making "***automated*** telemarketing calls to [Plaintiff] and other putative members of the class without their prior express written consent." (ECF 1, ¶ 2 (emphasis added).) To substantiate his claim, Plaintiff is required to establish that the device used to place the calls at issue qualifies as an ATDS under the TCPA. The TCPA prohibits a person from making "any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice . . . (iii) to any telephone number assigned to a . . . cellular telephone service[.]" 47 U.S.C. § 227(b)(1)(A). As a result, Plaintiff must prove that: (1) HomeAdvisor made a call to a cell phone; (2) using an ATDS or an artificial or recorded voice; (3) without prior express consent of the called party. *Satori v. Susan C. Little & Assocs., PA*, 571 Fed. Appx. 677, 682 (10th Cir. 2014). HomeAdvisor disputes that it used an ATDS to place the

calls at issue, and therefore, a central and dispositive issue in this case will be whether an ATDS was used.

**II.     With Its Prior Interpretation Of ATDS Set Aside, The FCC Is Again Considering The Definition Of ATDS.**

The TCPA was enacted in 1991 and defines an ATDS as "equipment which has the capacity . . . to store or produce telephone numbers to be called, using a random or sequential number generator; and . . . to dial such numbers." 47 U.S.C. § 227(a)(1). The FCC is responsible for prescribing regulations implementing the TCPA and has done so through a "series of rulemakings and declaratory rulings addressing the [TCPA's] reach." *ACA Int'l*, 885 F.3d at 693.

Following the TCPA's enactment, the FCC clarified that an ATDS must generate numbers in a random or sequential fashion. In 1992, the FCC explained that the TCPA's prohibitions against using an ATDS "clearly do not apply to functions like 'speed dialing,' 'call forwarding,' or public telephone delayed message services (PTDMS), because the numbers called are not generated in a random or sequential fashion."[2] In a subsequent 1995 Ruling, the FCC described "calls dialed to numbers generated randomly or in sequence" as "autodialed."[3] In 2003, the FCC issued another order finding, among other things, "that a predictive dialer falls within the meaning and statutory definition of 'automatic telephone dialing equipment' and the intent of Congress."[4] The 2003 Order defined a predictive dialer as "an automated dialing system that uses a complex

---

[2] *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 7 FCC Rcd. 8752, 8776 (1992).

[3] *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 10 FCC Rcd. 12391, 12400 (1995).

[4] *In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 FCC Rcd. 14014, 14093 (2003) ("2003 Order").

set of algorithms to automatically dial consumers' telephone numbers in a manner that 'predicts' the time when a consumer will answer the phone and a telemarketer will be available to take the call."[5] According to the FCC, predictive dialers fell within the definition of an ATDS, even though they may not "store or produce telephone numbers to be called, using a random or sequential number generator," as stated in the plain language of the TCPA.[6] The FCC took the position that the defining characteristic of an ATDS is "***the capacity to dial numbers without human intervention.***"[7] Despite the fact that a predictive dialer might not fit squarely within the statutory definition of an ATDS, the FCC found that it was the sort of *automated* equipment Congress intended to address because it has the "capacity to dial numbers without human intervention."[8]

In 2008, the FCC issued a declaratory judgment "affirm[ing] that a predictive dialer constitutes an automatic telephone dialing system and is subject to the TCPA's restrictions on the use of autodialers."[9] Then, in 2012, the FCC again reiterated that the TCPA's definition of an ATDS "covers any equipment that has the specified capacity to generate numbers and dial them without human intervention regardless of whether the numbers called are randomly or sequentially generated or come from calling lists."[10]

---

[5] *Id.* at 14143 n.31.

[6] *Id.* at 14091.

[7] *Id.* at 14092 (emphasis added).

[8] *Id.* at 14092–93.

[9] *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 23 FCC Rcd. 559, 566 (2008).

[10] *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 FCC Rcd. 15391, 15392 n.5 (2012).

Finally, in 2015, the FCC issued another declaratory order concerning the definition of an autodialer.[11] In the 2015 Order, the FCC took an extremely expansive view of the definition of an ATDS and determined that the "capacity" to dial numbers randomly or sequentially ***"includes … potential functionalities," not just its "present ability."*** [12] Despite this broad definition, the FCC simultaneously purported to reaffirm its prior position that the "basic function" of an autodialer is the ability to "dial numbers ***without human intervention***."[13]

In *ACA International*,[14] the D.C. Circuit addressed various challenges to the 2015 Order and struck down portions of the order, including "which sorts of automated dialing equipment are subject to the TCPA's restrictions on unconsented calls[.]"  885 F.3d at 691.  HomeAdvisor contends, as several other courts have held, that the D.C. Circuit also vacated the FCC's 2003 and 2008 prior rulings related to the definition of an ATDS.[15] In rejecting the FCC's interpretation of an ATDS, the D.C. Circuit held that it fell "short of reasoned decisionmaking in offer[ing] no

---

[11] *See In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30 FCC Rcd. 7961 (2015) (the "2015 Order").

[12] *Id.* at 7974–76 (emphasis added).

[13] *Id.* at 7975 (emphasis added).

[14] The D.C. Circuit's decision in *ACA International* is binding on courts outside of the D.C. Circuit. *See, e.g., Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d 460, 467 (6th Cir. 2017), *as corrected on denial of reh'g en banc* (Sept. 1, 2017), *cert denied*, 138 S. Ct. 1284 (2018).

[15] *See, e.g., Asher v. Quicken Loans, Inc.*, No. 2:17-cv-1203, 2019 U.S. Dist. LEXIS 4146, at *8 (D. Utah Jan. 8, 2019) (noting that "the invalidated FCC guidance had deemed certain predictive dialers to be ATDSs despite the fact that they do not meet the statutory definition."); *Gonzalez v. Ocwen Loan Servicing, LLC*, No. 5:18-cv-340, 2018 U.S. Dist. LEXIS 153480, at *14 (M.D. Fla. Sept. 5, 2018) ("the D.C. Circuit necessarily vacated the definition in the prior FCC Orders that the 2015 Order merely reaffirmed. To conclude otherwise would mean that courts are required to apply the definition of an ATDS—from the 2003 and 2008 Orders—that the D.C. Circuit vacated when reviewing the 2015 Order.").

meaningful guidance to affected parties" because it chose differing, contrary interpretations or no interpretations at all as to ATDS functionality. *Id.* at 701.

Regarding the question of "what it means for equipment to have the 'capacity' to perform the autodialer functions enumerated in the statute," the D.C. Circuit noted that "the Commission adopted an expansive interpretation of 'capacity' having the apparent effect of embracing any and all smartphones." *Id.* at 695–96. The court found that this expansive definition swept too far and that: "[t]he more straightforward understanding of the Commission's ruling is that all smartphones qualify as autodialers ***because they have the inherent 'capacity' to gain ATDS functionality by downloading an app.***" *Id.* at 700 (emphasis added). Such an interpretation, however, was "an unreasonably, and impermissibly, expansive one." *Id.*

Regarding human intervention, the D.C. Circuit was troubled by the fact that although the FCC had consistently stated "that the 'basic function' of an autodialer is the ability to 'dial numbers without human intervention,'" it "***nevertheless declined a request to 'clarify[ ] that a dialer is not an autodialer unless it has the capacity to dial numbers without human intervention.***'" *Id.* at 703 (quoting 30 FCC Rcd. at 7973, 7975–76) (emphasis added). The court found "[t]hose side-by-side propositions [] difficult to square." *Id.* at 703.

Finally, the D.C. Circuit noted that "the Commission further said that another 'basic function[ ]' of an ATDS is to 'dial thousands of numbers in a short period of time." *Id.* at 703. However, the FCC "impart[ed] no additional guidance concerning whether that is a necessary condition, a sufficient condition, a relevant condition even if neither necessary nor sufficient, or something else. Nor does it indicate what would qualify as a 'short period of time.'" *Id.* The result

was that "***affected parties are left in a significant fog of uncertainty about how to determine if a device is an ATDS so as to bring into play the restrictions on unconsented calls.***" *Id.* (emphasis added).

In light of the D.C. Circuit's decision, the FCC must now decide if anything beyond a system that randomly or sequentially generates numbers and then dials them can constitute an ATDS. If the FCC answers that question in the affirmative, it must then clarify what level of human intervention is required, and what dialing thousands of numbers at a time really means. The FCC is poised to address the issues left open by *ACA International*. Notably, the composition of the Commission has changed significantly in recent years, and the new Chairman Ajit Pai, was a vigorous dissenter to the 2015 Order.[16]

Just two months after the D.C. Circuit's ruling, the FCC issued its Request for Comment with initial comments due on June 13, 2018 and reply comments due June 28, 2018. In its Request, the FCC posed the following pertinent questions:

- We seek further comment on the functions a device must be able to perform to qualify as an automatic telephone dialing system. Again, the TCPA defines an "*automatic* telephone dialing system" as "equipment which has the capacity— (A) to store or produce telephone numbers to be called, *using a random or sequential number generator*; and (B) to dial *such numbers*." Regarding the term "automatic," the Commission explained that the "basic function[]" of an automatic telephone dialing system is to "dial numbers without human intervention" and yet "declined to 'clarify[] that a dialer is

---

[16] In a statement released on the day of the *ACA International* decision, Chairman Pai foreshadowed that the Republican-led Commission would take a different approach on the interpretation of the TCPA from the previous administration: "Today's unanimous D.C. Circuit decision addresses yet another example of the prior FCC's disregard for the law and regulatory overreach. As the court explains, the agency's 2015 ruling placed every American consumer with a smartphone at substantial risk of violating federal law. That's why I dissented from the FCC's misguided decision and am pleased that the D.C. Circuit too has rejected it." FCC Statement, "Chairman Pai Statement on D.C. Circuit Decision Curbing Regulatory Overreach" (Mar. 16, 2018), *available at* https://www.fcc.gov/document/chairman-pai-dc-circuit-decision-curbing-regulatory-overreach (last visited Sept. 23, 2019).

not an [automatic telephone dialing system] unless it has the capacity to dial numbers without human intervention.'" As the court put it, "[t]hose side-by-side propositions are difficult to square." The court further noted the Commission said another basic function was to "dial thousands of numbers in a short period of time," which left parties "in a significant fog of uncertainty" on how to apply that notation.

- How "automatic" must dialing be for equipment to qualify as an automatic telephone dialing system?

- Does the word "automatic" "envision non-manual dialing of telephone numbers?"

- Must such a system dial numbers without human intervention?

- Must it dial thousands of numbers in a short period of time? If so, what constitutes a short period of time for these purposes?[17]

On October 3, 2018, the FCC issued a public notice seeking further comment on the ATDS definition in light of the Ninth Circuit's decision in *Marks v. Crunch San Diego, LLC*, 904 F.3d 1041 (9th Cir. 2018).[18] The FCC set a comment deadline of October 17, 2018 and a reply comment deadline of October 24, 2018.[19]

### III. Following *ACA International*, Courts Have Reached Inconsistent Decisions Regarding The Definition Of An ATDS.

Ever since *ACA International* was decided, courts have split over the import of the decision, the status and continuing viability of the FCC's prior orders, and the definition of an ATDS. For example, the Second, Third, and Ninth Circuits have issued opinions on the ATDS definition since *ACA International* and have taken sharply diverging views.

---

[17] Request for Comment at 2–3 (internal citations omitted) (emphasis in original).

[18] *See* Consumer and Governmental Affairs Bureau Seeks Further Comment on Interpretation of the Telephone Consumer Protection Act in Light of the Ninth Circuit's *Marks v. Church San Diego, LLC* Decision, Docket No. 02-278 (Oct. 3, 2018).

[19] *See id.*

Both the Second and Third Circuits agreed with the D.C. Circuit's holding that the ATDS definition cannot include a system's potential capacities. *See King v. Time Warner Cable, Inc.*, 894 F.3d 473, 477 (2d Cir. 2018); *Dominguez v. Yahoo, Inc.*, 894 F.3d 116, 119 (3d Cir. 2018).[20] Despite these holdings, neither court reached the questions of whether the FCC's prior orders regarding predictive dialers remain good law or how the human intervention standard has been affected. Indeed, the Second Circuit in *King* expressly highlighted the open questions that remain in the wake of the *ACA International* decision. In response to Time Warner's argument that "the district court improperly relied on a 'human involvement' standard that is not reflected in the statute," the court noted that the FCC declined to adopt a standard in its 2015 Order and stated "we venture no opinion on whether that lack of human involvement is a consideration relevant to King's claims." *King*, 894 F.3d at 482.

Taking a decidedly different approach, the Ninth Circuit determined that *ACA International* vacated the prior FCC orders regarding the ATDS definition and, based on the statutory text alone— which it found "not susceptible to a straightforward interpretation"—held that "equipment that ma[kes] automatic calls from lists of recipients [is] also covered by the TCPA." *Marks,* 904 F.3d at 1051. The Ninth Circuit thus departed from the Third Circuit's holding that random or sequential number generation is required for a device to be considered an ATDS and, in fact, read the words random or sequential number generator out of the statute.

---

[5]Additionally, the Third Circuit expressly stated that random or sequential number generation is required to fit within the statutory ATDS definition and the Second Circuit appeared to accept that approach. *See Dominguez*, 894 F.3d at 121 (stating "key factual question" is "whether the Email SMS System functioned as an autodialer by randomly or sequentially generating telephone numbers, and dialing those numbers"); *see generally King*, 894 F.3d 473.

In addition, the Ninth Circuit, differing from the Second Circuit in *King*, also offered its opinion on the human intervention issue, stating that "[w]e also reject Crunch's argument that a device cannot qualify as an ATDS unless it is fully automatic, meaning that it must operate without any human intervention whatsoever" and that the at-issue system "dials numbers automatically, and therefore it has the automatic dialing function necessary to qualify as an ATDS." *Id.* at 1053.

These court rulings demonstrate the risk of disparate interpretations of the TCPA in the absence of clear guidance from the FCC. Some courts have held that *ACA International* rejected the prior FCC orders and that random or sequential number generation is required to state a claim.[21] Other courts have held that *ACA International* left the prior FCC orders intact, meaning predictive dialers, which did not necessarily randomly or sequentially dial numbers, are autodialers.[22] Compounding this confusion is the issue of human intervention and courts' varying standards for what level of human intervention is required to take a system out of the ATDS definition.

Given that the FCC is poised to provide much needed clarity regarding each of these issues, a stay is appropriate under the primary jurisdiction doctrine.

---

[21] For example, in *Pinkus v. Sirius XM Radio, Inc.*, 319 F. Supp. 3d 927, 935 (N.D. Ill. 2018), the district court held that *ACA International* invalidated the 2003 and 2008 FCC rulings to the extent they suggest, as the 2015 Order did, "that a predictive dialer qualifies as an ATDS even if it does not have the capacity to generate phone numbers randomly or sequentially and then to dial them." *See also Gonzalez*, 2018 U.S. Dist. LEXIS 153480, at *14 (holding *ACA International* overturned the 2003 and 2008 FCC Orders).

[22] By contrast, the *Reyes* decision from the Southern District of Florida, for example, held that *ACA International* left the FCC's 2003 ruling regarding predictive dialers in effect. *Reyes*, 312 F. Supp. 3d at 1320 ("the *ACA International* case has given the Court considerable pause. But the Court finds that the prior FCC Orders are still binding.").

## ARGUMENT

**I.     A Stay Is Warranted By The Primary Jurisdiction Doctrine.**

The primary jurisdiction doctrine is "invoked in situations where the courts have jurisdiction over the claim from the very outset but it is likely that the case will require resolution of issues, which under a regulatory scheme, have been placed in the hands of an administrative body." *Marshall v. El Paso Nat. Gas Co.*, 874 F.2d 1373, 1376 (10th Cir. 1989) (citations omitted). The doctrine applies "to claims properly cognizable in court that contain some issue within the special competence of an administrative agency." *TON Servs. v. Qwest Corp.*, 493 F.3d 1225,1238 (10th Cir. 2007) (quoting *Reiter v. Cooper*, 507 U.S. 258, 268 (1993)).

In invoking the primary jurisdiction doctrine, courts in the Tenth Circuit "consider whether the issues of fact in the case: (1) are not within the conventional experience of judges; (2) require the exercise of administrative discretion; or (3) require uniformity and consistency in the regulation of the business entrusted to a particular agency." *Crystal Clear Communications, Inc. v. Southwestern Bell Tel. Co.*, 415 F.3d 1171, 1179 (10th Cir. 2005) (citing *Marshall*, 874 F.2d at 1377). Application of the doctrine to stay a case is particularly appropriate in situations where an agency's pending decision applies to the precise issue presented by the litigation. *Higgenbotham*, 2014 U.S. Dist. LEXIS 65915, at *10 (granting a motion to stay a TCPA case because resolution of pending FCC petitions regarding the definition of an ATDS would directly impact the questions presented by Plaintiff's claims).

**A.     Determining What Equipment Falls Within The Definition Of ATDS Requires The FCC's Expertise.**

First, although courts frequently engage in statutory interpretation, interpreting and applying the definition of an ATDS to the system allegedly used by HomeAdvisor to place the

calls at issue is not within the conventional experience of judges, but instead involves legislative interpretation, as well as technical and policy considerations. *See Higgenbotham*, 2014 U.S. Dist. LEXIS, at *9 ("The seminal question of [the TCPA's] reach is a technical one, which falls in the ambit of the FCC's administrative expertise."); *Lee,* 2014 U.S. Dist. LEXIS, at *4 (staying TCPA action pending FCC ruling so that "the FCC will be allowed to apply its own agency experience and technical expertise to the specific question of capacity."); *Mical Communications, Inc. v. Sprint Telemedia, Inc.*, 1 F.3d 1031, 1040 (10th Cir. 1993) ("[I]t appears to us that the appropriate characterization of [services regulated by the FCC] requires expertise and a familiarity with the industry.").

As discussed throughout this Motion, in addition to confusion regarding the definition of "capacity," there is considerable uncertainty regarding other critical issues including human intervention, whether an ATDS must dial thousands of numbers in a short period of time, what constitutes a short period of time for ATDS purposes, and the like. These issues are not within the conventional experience of the courts and involve technical and policy considerations that are best considered by the FCC in the first instance based on its particular expertise.

### B. Application Of The ATDS Definition To Various Types Of Dialing Equipment Requires Administrative Discretion.

Second, a determination of what type of dialing equipment constitutes an ATDS is a matter of administrative discretion. There is no dispute regarding the FCC's authority to determine the definition of an ATDS. "Congress vested the FCC with considerable authority to implement the [TCPA]" including the power to "prescribe regulations to implement" the legislation and "interpretive authority over the . . . Act . . . and its accompanying regulations." *Charvat v. EchoStar Satellite, LLC*, 630 F.3d 459, 466 (6th Cir. 2010). Thus, as courts in the Tenth Circuit have

13

recognized, how to interpret the definition of an ATDS requires an exercise of administrative discretion that properly lies with the FCC in the first instance. *Higgenbotham*, 2014 U.S. Dist. LEXIS, at *9 (noting that how the FCC ultimately defines the term "capacity" for purposes of defining an ATDS "is a matter of administrative discretion."); *Lee*, 2014 U.S. Dist. LEXIS, at *4.

### C. Determining What Types Of Systems Constitute Autodialers Requires Uniformity of Administration.

Finally, a stay would promote uniformity and consistency in the interpretation of the ATDS definition. In addition, it would also protect against forum shopping. Indeed, here, Plaintiff is a resident of Pennsylvania (ECF 1, ¶ 5), but a lawsuit filed in that jurisdiction would be governed by the Third Circuit's decision in *Dominguez*. In addition, if this case is not stayed, there is a risk that the Court could reach a determination that is inconsistent with the FCC's ultimate decision on the definition of an ATDS. Since *ACA International* was decided, and in the absence of FCC guidance, courts have already issued inconsistent rulings on a number of the issues raised by the Complaint. Giving time for the FCC to decide how the system at issue in this case is to be treated under the statute will allow for uniformity of administration. *See Higgenbotham*, 2014 U.S. Dist. LEXIS, at *9-10 (recognizing "a real possibility that a decision by this court prior to the FCC's response to the . . . petitions would result in conflicting decisions, either between our court and the FCC or our court and another circuit if the FCC ruling is appealed."). As all three factors favor a stay, this case should be stayed under the primary jurisdiction doctrine.

### II. This Court Also Has The Inherent Power To Issue A Stay.

"[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). In determining

whether to grant a stay, courts generally consider whether the plaintiff's interest in proceeding and any potential prejudice a stay may pose to plaintiff; the burden on the defendant; the convenience to the court; the interests of persons not parties to the litigation, if any; and the public interest. *Fireman's Fund Ins. Co. v. Steele St. Ltd. II*, No. 17-cv-01005, 2019 U.S. Dist. LEXIS 23702, at *11 (D. Colo. Feb. 13, 2019).

First, Plaintiff will not be prejudiced by waiting until the FCC issues its interpretive ruling. Plaintiff has not alleged that he continues to receive calls from HomeAdvisor or has suffered any other continuing harm. And, the case is in the earliest stages. There is no reason or need for the parties to waste resources and time engaging in discovery that might be unnecessary or greatly reduced when the FCC issues its interpretive ruling. Second, a stay will simplify the issues and streamline a trial, should one take place. For example, a well-reasoned interpretive ruling from the FCC on the ATDS issue would simplify issues for the parties and Court in both fact discovery and expert discovery. Third, as discussed above, the FCC's interpretive ruling will likely have a dispositive effect on this litigation and, as a result, reduce (or eliminate entirely) the burden of this litigation on the parties and the Court.

## **CONCLUSION**

For the foregoing reasons, HomeAdvisor respectfully requests that the Court stay this matter to await further guidance from the FCC pursuant to its May 14, 2018 Public Notice seeking comment on, among other things, the definition of an ATDS.

Dated: October 7, 2019   Respectfully submitted,

/s/ *Brent R. Owen*
Brent R. Owen, #45068
David Blake, #25202
Squire Patton Boggs (US) LLP
1801 California Street, Suite 4900
Denver, Colorado 80202
O  303 830 1776
F  303 894 9239
Brent.owen@squirepb.com
David.blake@squirepb.com

Eric J. Troutman
Emily L. Wallerstein
Squire Patton Boggs (US) LLP
555 South Flower Street, 31st Floor
Los Angeles, California 90071
O  213 624 2500
F  213 623 4581
eric.troutman@squirepb.com
emily.wallerstein@squirepb.com

Amy Brown Doolittle
Squire Patton Boggs (US) LLP
2550 M Street, NW
Washington, DC 20037
O  202 457 6000
F  202 457 6315

*Attorneys for Defendant HomeAdvisor, Inc.*